Good morning, Your Honors. Daniel Gallagher, representing Dorothy Porter in this appeal. Your Honors, this is my first appearance, too, so just so you know, you're not alone. Ms. Porter is here. She'll be nice, don't worry. I appreciate it. Maybe I'll be able to sleep tonight. Fondly. Thank you. Ms. Porter appeals the district court's dismissing her claims, as the Court is aware, at summary judgment primarily, although there are other issues on the appeal, including the district court's decision to reject the claims of Ms. Porter's motion. You need to keep your voice up, though. Thank you. And we submitted to the Court a letter earlier this week that we'd be relying on Anderson v. Warner as well. We haven't. All right, thank you. I didn't see the relevance of that case. Can you help me with that? What does Anderson teach us? Well, the district court relied on Stanowich, Van Ork v. Stanowich, in making the decision regarding color of law. And it seemed to us that the Anderson decision more clearly articulated the Ninth Circuit's position on color of law and when it applies in incidents of arrest. And specifically, that they're in that there is no rigid formula for measuring state action for purposes of Section 1983 liability, that it's, again, a process of sifting facts and weighing circumstances. And that in the Anderson decision, the Court recognized that even though Officer Warner acted beyond the scope of his normal duties in giving a beating to an individual that ran into the back of his car, he was still acting under color of law because he announced that he was an officer, I'm a cop, this is under control. And similarly, Officer McPherson, in our case, announced when he made his initial contact with Valley Com Dispatchers, I'm an officer of the law and we need assistance here. He continued to act under color of law when the officers arrived and contributing to charging theories and assisting with the investigation in terms of the law. Well, that sort of looks like he took advantage of his insight into the police department. But doesn't the – it isn't a real critical question here whether or not there was probable cause. Exactly, Your Honor. If there's probable cause, you really have no claim against this, I think what his name is. McPherson. Yes, Your Honor. That's correct. The district court found that they had probable cause. I'm sorry. There is probable cause. There is no claim. The district court found that there was probable cause. That's right. You know, where did the district court go wrong? Well, the district court – well, first of all, ordinarily under McKenzie and Lamb, it's our understanding that factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury. So what the court – what the district court did was it basically judged the credibility of the plaintiff in determining the probable cause. Well, look, you can look at the facts. What facts were disputed? The disputed facts were that essentially under the statute that the plaintiff was arrested under was that the court concluded that Ms. Porter violated that statute by repeatedly – Well, the officers aren't making that decision on the spot. We're looking at what the officers were doing at the time they took her into custody.  So we're looking at how they were operating at that time, what information they had. They determined that they had probable cause. So I'm – and the district court agreed with that. So I'm asking you what's the dispute there that would require a jury to assess the reasonableness of their conduct? Because if there's no real factual dispute, the court's quite capable of making that determination as well. That's correct, Your Honor. And it's Ms. Porter's position that at the scene, she indicated that she saw Officer McPherson hold up a shiny object. And that was the initial discussion regarding Officer McPherson, while he was still within the cab of his truck, making any sort of a move that she could comment on. And she was being interrogated by these officers and was under an obligation to respond truthfully to them. And she did – she did indicate that she saw him raise up a shiny object. And it's her point. Counsel, even if there is a genuine issue of fact about whether she knowingly falsely accused McPherson of pointing a gun at her, isn't – as Judge Pius says, isn't that irrelevant? The question is, what did the officers know at the time they made the arrests? What did the officers know? And would a reasonably prudent person under the objective standard find that probable cause would support an arrest under that – Exactly. Under that cause – under that criminal activity, alleged criminal activity. So whether or not she did or did not is irrelevant. The question is, what did the officers think at the time they made the arrests? What was before them? Well, that's correct. But what we're contesting is that the facts and circumstances aren't as the defendants are portraying them to the district court. Our – Ms. Porter's contesting that the facts and circumstances aren't what the arresting officers are saying they were, and they aren't what Officer McPherson is saying they are as well. But, Counselor, what the district court had before it, though, was whatever it was in the record. And other than Chief Ben Merrick, whom I think his name is affidavit, what evidence was there in the record at the time this decision was made by the district court that suggested that the officer did not have probable cause? Well, there was Ms. Porter's – Ms. Porter's declaration indicating that she saw a shining object and that her comment to Officer McPherson – or Officer Morse was that it may have been a gun in response to his queries to her. Isn't that the very basis of the charge in the first place? It is, but that should be, in our opinion, a factual determination. Why is that a material fact with respect to probable cause? I don't quite understand your argument. All right. Well, it's our position that under the – the officers that are making the decision to arrest are doing so with an understanding of what the elements of the cause of action are. In other words, they have to determine that the elements are sufficiently indicated to be met by the facts and circumstances of the events that are taking place at the time and that when you apply the elements of the statute of false reporting, there's no – even under the facts that were submitted or reviewed by the district court, there's no indication that those facts were met and that the elements were – or rather that the elements were met by the facts. In other words, it's required under the state statute that the district court relied on that with knowledge that the information reported or conveyed is false, the individual also must know that the false report is likely to cause evacuation of a building, in this case it would probably be more applicable to say cause public inconvenience or alarm. And it's our position that there's no reasonable basis for an objective officer to conclude that Ms. Porter would be under any sort of knowledge that her telling him that she saw a gun or that she saw a shiny object was likely to cause inconvenience or public inconvenience or alarm. But look what the officers had before them. Ms. Porter, initial request of the officer, Morse, arrested McPherson for violating protection order. Officer Morse found no computer record of the order. Then Officer Adams relayed that McPherson accused Porter of making threatening gestures. Porter then said that McPherson held up a shiny object at her that could have been a gun. Why isn't it sufficient for probable cause for the officers to arrest her? Well, under the totality of what was happening at the time, you know, it's our position that probable cause simply didn't exist under the facts that Ms. Porter is presenting to the district court. And the district court indicated in the opinion, in the order, that it was making he was making a credibility determination of Ms. Porter's credibility based on inconsistencies in the pleadings, as opposed to a determination based on the representations of the facts at the time of the arrest. Your Honor, in addition, the – well, I don't know if I've addressed probable cause efficiently, but. Let me go on to a different issue. What evidence do you have in the record that supports Ms. Porter's claim that the officer's conduct was specifically motivated by her membership in the class of, and I quote, women under the umbrella of safety protected by court protection? Well, the evidence in the record is that in 2001, Ms. Porter provided a copy of her parenting plan with the incorporated protection order in it to the Auburn Police Department. They were supposed to receive that when the order was initially entered by the court. But that's her. She's alleged that she was a member of a class of people similarly protected. What evidence is there that these officers were violating the law in the sense of your allegations based upon membership in the class? Well, it would be Ms. Porter's position that knowledge, constructive knowledge of the existence of the protection order and the fact that it has not expired and has not been amended is imputed to the officers of the defendant of the city of Auburn when they receive actual notice. They have possession of the protection order. They know it exists. And for them to say we checked the WASC and it didn't show the protection order, we would suggest that that's insufficient to shield them from liability. But that's her. Where's the class concept? That's part of your allegation. Where's evidence of members of the class of people similarly protected that's been violated by these officers or that they even knew that such a class existed if it did? I'm not sure I understand the question. Well, your allegation is that the officers were motivated by membership by your client in the class of, in quotes, women under the umbrella of safety provided by court protection. I'm asking you what evidence is there that supports your client's claim that these officers' conduct was specifically motivated to try to injure people who were part of that, in quotes, class? I understand. Well, again, it would be the totality of the circumstances, their knowledge of the existence of the protection order, their intentional, their obvious intentional decision to disregard the existence, her membership in the class and the existence of the protection order, and their willfulness in determining that they could violate her constitutional protections under the Fourth Amendment by seizing her and searching her in violation of her membership in the class. The problem with that argument is that the officers checked to see if there was a protection order and didn't find it. So there was no evidence that, as a result of that order, they were acting against the class. Rather, it appeared to be personal animosity toward Ms. Porter. That's what the district court found. Well, that is what the district court found. It's important to remember, though, that the year before her arrest, Ms. Porter was having difficulties with Officer McPherson's contributions under the parenting plan. She contacted the city of Auburn, seeking assistance, and at that time they became aware of the protection order, if not earlier, and by their own actions disregarded her membership in that class and actually actively worked against her by disregarding the protection order and ultimately arresting and incarcerating her. And we would agree, obviously, that this was a personal vendetta by Officer McPherson. He was motivated, in our opinion, by his anger or whatever his emotional feelings were towards Ms. Porter in orchestrating this event, whether it was planned before or whether it just happened at the spur of the moment on August 8, 2002. But the city of Auburn may claim that they checked the computer to see whether there That's not sufficient. They actually had possession of the protection order and knowledge is computed to the officers. They have a duty under state law. You mean the officers on the scene had a copy of the protection order? Well, the city had a copy of the protection order. The city did. But the city is an organization made up of a lot of people. Are you suggesting that every police officer out on the beat has a copy of all of the protection orders that may be issued by a local court against members of the police department in the city? Well, you know, again, this would apply specifically to the facts of this case as opposed to maybe the city of Los Angeles, the city of Auburn. Oh, take Auburn. Is that what you're saying? Essentially. Essentially, our argument is that there is a principal agency relationship and that constructive knowledge of the existence of the protection order. I mean, what else can a citizen do? What else can a single mother do? If she obtains a protection order from a court of law and the process may or may not have worked so that the city of Auburn may or may not have had a copy of the protection order, she physically hands a copy of the protection order to a representative of the city of Auburn, a sergeant in the police force. What more is her obligation? What other obligations does she have? She tells them at the scene, I have a valid protection order. He shouldn't be here. He's harassing me. They ignore that. Well, they checked it out and found it not to be in the computer. What more? The question is, what do the officers know at the time they made the arrest to amount to probable cause? And they did check it out and found no record of it. Well, at the scene, they found no record of the protection order, but they were made aware of the protection order's existence by Ms. Porter as well as by Officer McPherson. Officer McPherson at the scene said, yeah, there is a protection order. He didn't think it was valid at the time, but there was a protection order. The officers at the scene knew there was a protection order. And it's our position, Ms. Porter's position, that they had more of an obligation under law to determine whether or not there was an ineffective protective order. If they had, you know, besides checking the computer, I mean, she told them how they received the protection order. She told them she'd given it to the sergeant a year earlier. And if they had made a phone call, then they would have found out the protection order was in existence. I understand your argument. I think you've answered it. Given your answer, I don't want to use up more of your time. Okay. Would you like to take some time for rebuttal? Five minutes. Down to four. Okay. Thank you, Your Honor. Good morning, Your Honor. Morning, Counsel. My name is Janie Freeman, and I represent the City of Auburn and Auburn officers Kevin Morse and Paul Adams, who were the arresting officers at the scene. They were the only officers in this case who actually acted under color of law and took action under the authority of the City of Auburn with respect to Ms. Auburn, or Ms. Porter, on August 8th of 2002. One thing that I think all the parties can agree on is that there are historical facts to which Greg McPherson and Dorothy Porter disagree. That case was tried to the jury in November of 2004, and the jury returned a defense verdict against Ms. Porter in favor of Greg McPherson. And as Counsel just represented, the real disagreement here... That was a different claim, though, correct? It was a malicious prosecution. Malicious prosecution, right? Arising out of the same arrest on the same day, Your Honor, which essentially ends in the same result, which is the bottom line question where Dorothy Porter's Fourth Amendment rights against unreasonable seizure, against an unlawful arrest, violated that day in August of 2002. It is important to remember a couple of things. The reason we're here in federal court today is because of this arrest in August of 2002, not because of any other disagreement that Greg McPherson and Dorothy Porter may have, not because of any other complaints that Dorothy Porter may have brought to the Auburn Police Department over the past two decades with regard to child support or other matters. The only reason the federal court is involved is because she was arrested in August of 2002, and so the questions in this case go only to, again, whether probable cause existed for that arrest and whether facts and the law support cognizable legal claims against the parties in this action. It's important and at times confusing to remember who the parties are, and I want to ensure that the court doesn't mix up the names of the parties. We know who the parties are. Okay. Again, the arresting officers... We know at least that much. ...are Officers Morse and Adams. Right off the bat, Your Honor, you had a question about the new case that counsel brought to the court's attention that addresses acting under color of law, and I believe Mr. Bolasina is going to address this more. But it is actually, the case is great because it illustrates the distinctions between when an officer does act under color of law and when an officer does not act under color of law. When you read this, you sort of get the impression that he well knew the ins and outs of the police department. And? And, well, he learned, he had, he just wasn't your average citizen. And that may be true. There is no question that this citizen... And he acted at times as though he were, he was a cop, acting as a cop. Well, actually, Your Honor, let's look at that. I think it's important to consider... No, well, you know, I don't want to, you know, what's probably critical here, I don't want to sidetrack in it, but go ahead if you want. But it's the whole, for me, it's the whole question of probable cause because if the district court was correct on its probable cause ruling, then this claim against McPherson goes away. You're absolutely right. Actually, the claims against the City of Auburn and the claims against the arrested officers under either Section 1983 and Section 1985 do go away. They go away. They need to set aside that probable cause. Exactly. And I think some of the questions that the panel brought up earlier go right to the point. We need to evaluate what the officers in the field knew at the time. And this, again, was Officers Morse and Adams, not just Greg McPherson and what he may have known and thought in his own mind. Judge Nelson, you actually gave a perfect snapshot of what the undisputed facts are. And appellant's counsel agrees that when these two officers were dispatched to the scene, they were just working in their regular duty. They were dispatched to the scene by dispatch. They arrived. And it's undisputed that it was Greg McPherson who called 911. It was not Dorothy Porter. It's also undisputed that when they first spoke with Dorothy Porter, she was the first one they had contact with, she agrees. She never mentioned anything about McPherson pointing a gun at her, pointing something shiny at her. She didn't say anything about, he has frightened me because he pointed something at me. What she said was, you need to arrest that man. You need to arrest him right now because I have a protection order and he's violating it by just driving through this public parking lot in a large strip mall. She never said he came anywhere near her. She said he drove in the parking lot and by that act, he's violating a protection order. She also agrees in her deposition testimony is excerpted in the briefs. She told those officers, if you do not arrest him right now, I'm going to make a citizen's arrest myself. Isn't there also a record that she kind of was constantly going to the city hall and making complaints to elected officials and other officials about this same man for not honoring his obligations? Absolutely. And that's what appellant's counsel had referred to a year earlier, that she had written letters to the mayor and to the police chief about whether or not Greg McPherson was honoring child support obligations. Now, there's no suggestion that the officers at the scene were aware of those specific facts at the time. Greg McPherson did suggest to them, he did tell them that some of this had been going on, but the officers themselves had not been the recipients of letters or whatnot. The officers did testify that at the scene they described her demeanor when they encountered her, that she was upset, that she was angry. She did not appear fearful. And, again, in any factual dispute aside, the undisputed facts are that she was standing out in the middle of the parking lot. She wasn't hiding. She wasn't inside the business. She wasn't otherwise taking actions that suggested she was someone who was fearful. And, again, it is significant that it is undisputed and the plaintiff agrees that this, that these were the facts that surrounded her first encounter with officers Morse and Adams. And she agrees it wasn't until they went and talked to McPherson and came back and reported McPherson saying you made gestures to her that she suddenly came up with, oh, well, I saw him point something shiny at me that was a gun. Mr. Gallagher made the point that the arresting officers should have been aware of the protective order. I'm not sure how many people there are in the police department. Would you like to comment? Your police officers generally, is the town so small that people in the police department are pretty much aware of all of the protective orders that are filed with the police department? Absolutely not, Your Honor. That's not only contrary to law, but in terms of the factual evidence in this case, appellant's own expert, Mr. Van Blericamp, testified in his deposition directly contrary to that. I asked him whether an officer in the field would be likely to know of all protective orders that were issued or all court orders, and he said absolutely not. I also asked him is it reasonable for officers in the field to check their computer system, specifically the WASC system, to check to determine whether a valid and enforceable order exists at the time they are out in the field. He said absolutely. That's where the officers check. I have no problem with the actions they took, and the officers are entitled to rely on that computer system. Unless they find an order in the computer system, they have no other way of determining whether an actual and enforceable protective order or order authorizing them to take any particular action is in existence at the time. So at the time they made the decision to arrest her or take her into custody, what additional information did they have? At the time they took Ms. Porter. When they finally decided, we're going to come with us, we're going to take you down on it.  The officer did bring up the allegation that Mr. McPherson may have pointed a gun at her. She immediately told them, and there were lots of witnesses to this. There were lots of witnesses. So they asked her who the witnesses were. Not only did she suggest there were lots, but then she specified that there was one who she indicated was her son who was inside the Midas muffler shop. So contrary to Appellate's suggestion, Officer Morris did not stop his investigation when he just heard Dorothy Porter say something. He did not say, I don't believe you. He didn't just say, that doesn't sound like Greg McPherson. I don't believe you. He continued his investigation. He canvassed the area. He went inside the Midas muffler shop. He talked to her son, who she had suggested had witnessed McPherson pointing a gun or a shiny object at her that she thought was a pistol. That child, who was 11 years old, denied seeing anything and seemed confused as to why he would ask him that. He also asked around to see if there were any other witnesses who had seen someone pull a weapon in the middle of this parking lot. And no one had seen that. He interviewed Greg McPherson's son, who was over near his location, and he hadn't seen it. In addition to what we've already discussed, when Ms. Porter said, I have a protection order and Mr. McPherson's violent, they went and checked it on the computer. And that didn't seem to match up. So they had a number of additional factors in addition to the way the facts played out, in addition to the way that she reported the crime, including considering the fact that she says he pointed a gun or she didn't call 911. Her actions didn't seem to corroborate or be consistent with them. So that information led the officers to reasonably believe that there was probable cause to believe that she had committed which offense? Of false reporting. At that point, after they concluded that investigation, the officers believed they had probable cause to believe that Ms. Porter had made a report to them when she said, he pointed a gun at me, that it could be false and that it could cause inconvenience or alarm to the public. And in fact, as Officer Morse testified in his deposition, not only was she demanding that they arrest this person for a very serious felony offense, he also had a concern that going around and asking people in this public area, did you see a man with a gun? Did you see a man with a gun? Could certainly cause public alarm. And again, the result of that, that she was, the relief in essence that she was encouraging was to go arrest this man for a felony for a felony crime. Now, if the officers would have been on top of all the criminal laws, is there any other criminal law that those facts would have supported? Well, that day on August 8th of 2002, Dorothy Porter was also charged with domestic violence harassment. The prosecutor, Prosecutor Amato, filed that charge against her. Both the municipal court judge, after a full evidentiary hearing, ruled that probable cause existed for both of those crimes. It's also significant in relation to your earlier question, Your Honor, the claim of malicious prosecution against Greg McPherson that went to the jury in this case was a claim of malicious prosecution based on the charge of domestic violence harassment. When this case went to the jury, the jury decided that Greg McPherson had not committed the offense of malicious prosecution, in essence, determining that probable cause also existed for the charge of domestic violence harassment. That's significant in this case for a couple of reasons. Under the law, if probable cause exists to arrest someone for one crime, then probable cause exists. And whether or not Officer Morse or Adams in the field decided to charge her with DV harassment at the scene. They could just make a mistake. They could. And the fact that probably it's because of the crime that they think has been committed. Because it's an objective standard, we just look at whether probable cause existed for a crime. Because, again, the end result is the same. If probable cause existed to arrest someone, their Fourth Amendment rights against an unreasonable seizure cannot be violated. It becomes a reasonable seizure and it becomes lawful. So let me ask you this. So if we would agree with the district court that there was probable cause to arrest, what's left? Nothing, Your Honor. That does resolve every claim that the plaintiff has against my clients, the City of Auburn, and against my clients, Officer Morse and Adams. I would say with exception, but I will address, there is one separate claim that plaintiffs are alleging against the City of Auburn, which is negligent supervision and retention. I would suggest that a finding of probable cause does eliminate that claim, but for slightly different reasons. Again, going back to the elements of negligent retention and negligent supervision. Plaintiffs suggest that under state law in this case, the employer was negligent in not firing or terminating Greg McPherson at some point prior to 2002 because of allegations Dorothy Porter had made that he maybe wasn't paying his child support properly or events had occurred over a decade earlier. A couple of reasons that that claim could not go forward. First, an employer can only be liable or an action can only exist for negligent supervision if the employee commits a wrongful act. It has to be a wrongful act that the employer knew or should have known they were likely to commit. It has to also have been committed while they're doing their job and furthering the interests of the employer. It also has to be supported by approximate cause, i.e., the employer's decision to not terminate the employee has to be the reason that, for example, in this case, Greg McPherson happened to call 911 on August of 2002 or happened to encounter Dorothy Porter. Here, because the jury has already ruled that Greg McPherson did not act unlawfully and did not act improperly, we don't have even the first element that an employee of the city of Auburn acted unlawfully. And our briefing fully covers the reason that the other elements aren't met as well. I will step down now so that Mr. Bolasina has a chance to address the court. Thank you, Your Honor, and we ask that the court affirm the dismissal of the remaining claims against the city now. Thank you. Good morning, Your Honors. My name is Mike Bolasina, and I'm counsel for Defendant Greg McPherson. I'm going to pick up where Judge Piaz left off or broke off in his questioning of Ms. Freeman, and that is, was Greg McPherson acting like a cop in connection with Ms. Porter's arrest? I think that the facts show that he wasn't, that he did have greater knowledge of the system, and I think that as Judge Robart recognized below, he may have had greater credibility with the responding officers, with the prosecutor, because he was a police officer and he was familiar with them, and they were familiar with him, but I don't think he crossed that line where he started acting like a cop at the scene as the police or as the corrections officer in Anderson v. Warner did. I think it's important to know that once he called 911, he said that he reported that Ms. Porter had made a threatening gesture and that he was going to go into the Department of Licensing and the responding officers could contact him there. At that point, he waited for them to come by and see him. There were certainly things that he could have done if he wanted to step into that role of a police officer. He could have begun to investigate himself. He could have had communication with Ms. Porter. For example, he could have even told her, you know, don't leave, I have called the police, or I'm ordering you to stay put until the responding officers come, but instead he didn't. He just went into the Department of Licensing and waited. When Officer Adams contacted him, what he did was similar to what he did when he called 911 dispatch, which is he actually told her what had happened, gave her some background as to the relationship that might be helpful to Officer Adams. At this point, he even said, I'm not asking that she be arrested, I just want the incident documented in case there's problems with her down the line. Next, Officer Morse came and interviewed him. And in response to Officer Morse, he denied that he had actually pointed his gun at her. Before you go on with that one, I didn't hear you say, or maybe I missed it, that when he spoke with the dispatcher, didn't he identify himself as a police officer? He identified himself as an off-duty officer by using his handle for that designation. And the reason he says he did that. By what? He identified himself as an off-duty police officer by? Using a code for that designation. By saying they get a special code, nine pertains to I am off-duty, three pertain to his level of seniority. And the reason he said he did that was because he thought that he would get better service. And that is if the dispatcher recognized him as an off-duty officer, they would process the call. So it's customary if you're a police officer in the city of Auburn and you're off-duty, that's what you do. Well, I don't think he has a lot of experience with calling 911 himself. No, I'm talking about, that's kind of how it operates. That is the way it operates. Within the police officer community. Correct. Just nine, you know, blah, blah, blah. Right. He identified himself as an off-duty officer. He said. Special. We'll be on our toes. Well, that's okay. But the interesting thing in this situation is he actually did not get that better service, possibly because it was a new dispatcher. She went through all the 20 questions with him regardless, and then actually gave the call a low priority consistent with what a threatening gestures call should receive. Counsel, I hate to interrupt, but you're about to run out of time. And I have a question about your client's cross appeal. If the sylvie would out decide that we were to affirm the lower court, does the cross appeal become moot? Well, legally, no. But, yes, it would become moot because we're not interested in going back to trial with regard to the cross appeal. We're only interested in going back to trial on that issue if we actually have to retry some of the plaintiff's claims. You do, I'm reading the Washington Code, allows recovery of $10,000 in statutory damages to a person prevailing upon the defense provided in this section, which possibly would pertain to your son. But you were saying now it would be moot. Correct. All right. Thank you. That's all I wanted to hear. Thank you. You still have a minute. Let me just go. I'm kind of curious about a couple of things. He was carrying his weapon as well that day. He had it, yeah. Is that sort of required of officers in the city? No. It is. They are allowed to and they are encouraged to, but it's not required. It's not required. And then the difference in opinion as to whether he had it in the car or in a fanny pack on his waist. There was a dispute over that? Yes. Let me ask you another thing. Did I read the record correctly when I noted that he went back to the police department to use the equipment to prepare a report? Yes. After her arrest and after she was charged with DV harassment, his testimony in his deposition was that he actually prepared his witness statement at the Auburn Police Department. Is that okay? I mean, is that customary for the officers to use police equipment for personal kinds of business? That I can't say, Your Honor. I don't think it was unpermitted because it was actually, you know, it was in connection with a prosecution that the police department was doing. I mean, typically the police officers could bring a witness back to the police department and have their statement prepared there. But he wasn't acting as a police officer there? No. Actually, he was still on his day off, but I believe that they had computer facilities and such there. He felt free that he could go back and just use the police equipment to get the testimony. So the city provided computers and whatnot to type up his statement? Correct, Your Honor. Okay. Thank you very much. Judge Smith, you asked earlier about the facts that would militate against defining a probable cause, and I'd just like to recite some of the statements that were made at deposition. Officer McPherson testified at Executive Director 51, page 8, lines 15 to the 16, in response to the question of what he saw when he arrived on the scene in the parking lot. The question was, did you notice anyone with her, Ms. Porter? He said, not that I saw. There was no witness present. So is it fair to say that if Officer McPherson pointed the gun while David McPherson was inside the Midas, then David McPherson would have just missed it? He would have not been able to see it. That was Officer Morse's response to a question at deposition. Officer Morse also testified, question ER 53, page 9, from his position, and that would be the son of Officer McPherson, is it your testimony that he could not see where Dorothy was? And again, the answer was, from his position, he couldn't see her. At ER 53, page 9, during that time, the exchange with Ms. Porter, he, the son of Mr. McPherson, was either inside the Department of Licensing or standing on the sidewalk in front of it. Now, counsel has emphasized the fact that the court, the district court, relied upon statements by these children that said they didn't see anything. But as the expert witness for Ms. Porter, Chief Van Blarekamp, said, absence of evidence is not evidence of absence. Neither of the children were in a position to see anything. So the fact that there were no witnesses to what took place shouldn't really come into the officer's decision-making process on whether or not probable cause existed. Additionally, the evidence militated in favor of a finding that he had pointed a gun. The identification of the weapon was as a shiny object. He didn't display the weapon at the scene when, in fact, Officer Morse concluded that, yes, Officer McPherson admitted, yes, it was a shiny gun. It was a shiny silver gun that I had in my possession at that time. And Officer Morse ---- Kennedy. She would have known that, though, having had a relationship with him, though, right? He actually stated, Officer McPherson ---- no, she did not. She hadn't had a relationship with him in years. She hadn't had a relationship with him since the early 90s, since 1992. And this was 2002. So it had been ten years. Ten years. Officer Morse ---- Officer McPherson had several weapons, as he testified, black weapon and then the silver weapon as well. They had an ongoing relationship in the sense that they had a child. Well, they did have a child together, but the relationship existed of sending checks. She would receive checks. They really didn't like each other and they didn't see each other. And he abandoned his son. It was not an issue of him being involved. The other aspect is that, you know, what's key, I think, here for a consideration of whether or not there was color of law was that Officer Morse ---- Officer Morse was preceded by Officer McPherson. When he called the prosecutor's office, he didn't get the charging that he wanted at the scene. He was the superior officer, as noted by his sign, you know, 9 Adam 3. He was the third, apparently, ranking out of 17 or so officers. He had a junior officer at the scene. The junior officer, who had a couple of years of law school under his belt, decided that there was no probable cause for domestic violence harassment. Officer McPherson was adamant that he wanted Dorothy Porter to spend the night in jail. This was retribution for him. And the way he solicited that, the way he made sure that happened was he called the prosecutor, acting as an officer under authority with a three-month prosecutor, and said, you know, this is what we need to do. We need to charge her. Excuse me. Which officer are you saying at some law school said there was no probable cause? Officer Morse, the arresting officer. He said that on the scene? He said that at deposition. He said there was no probable cause to support a charge of domestic violence harassment. That was his conclusion at the scene. Officer McPherson asked him to charge her with domestic violence harassment. He said he wanted her to spend the night in jail. That was his motivation. But that's a different charge than the one we're talking about, is it not? Well, that's correct. But the charge that ultimately the false reporting charge also is contradicted by the facts at the scene. And no reasonable person, no reasonable officer, knowing all the facts and circumstances, the fact that he had a silver gun, the fact that there were no reasonable basis to charge her with false reporting. And my time is up. Thank you. Thank you. Thank you.
judges: D.W. Nelson, Paez, Smith